IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Dewitt McDonald, Jr.,                                    Case No. 3:08 CV 1718

                                                         MEMORANDUM OPINION
                          Petitioner,                    AND ORDER_____

          -vs-                                           JUDGE JACK ZOUHARY

Warden Lebanon Correctional Institution,

                          Respondent.

### INTRODUCTION

Petitioner DeWitt McDonald, Jr., a prisoner in state custody, filed a Petition for Writ of Habeas Corpus (Doc. No. 1).  He seeks relief from his 1995 conviction in Erie County, Ohio, for complicity in the murder of Vivian Johnson.  The Sixth Circuit granted Petitioner permission to file this second habeas Petition challenging his conviction.  *See In re McDonald*, 514 F.3d 539 (6th Cir. 2008).

The case was referred to Magistrate Judge Vernelis Armstrong for a Report and Recommendation (R&R) pursuant to Local Rule 72.2(b)(2).  Following an extended discovery period and briefing (Doc. Nos. 5, 55, 61), the Magistrate recommended this Court grant a conditional habeas writ (Doc. No. 63).  Respondent filed an Objection (Doc. No. 64) to the R&R, to which Petitioner replied (Doc. No. 67).

In accordance with *Hill v. Duriron Co.*, 656 F.2d 1208 (6th Cir. 1981) and 28 U.S.C. § 636(b)(1)(B) & (C), this Court reviewed the Magistrate's findings *de novo*.  Further, this Court held

an evidentiary hearing on June 29, 2010 (Doc. No. 92).  For the reasons explained below, this Court declines to adopt the Magistrate's R&R.  The Petition is barred by the one-year statute of limitations, and Petitioner fails to make a showing of actual innocence.  Accordingly, the Petition is dismissed.

## PETITIONER'S CLAIMS

Petitioner's current request for habeas relief stems from his allegation that the prosecuting attorney, Erie County Prosecutor Kevin Baxter, had a sexual relationship with a key trial witness, Krista Harris, and forced her to give false testimony.  Petitioner raises three specific grounds for relief, each violating the Due Process Clause of the Fourteenth Amendment (Doc. No. 1):

- • The prosecution knowingly used perjured testimony.

- • The prosecution failed to disclose information that could be used to impeach inculpatory testimony.

- • The prosecution denied Petitioner the right to present defense witnesses (also violating the Compulsory Process Clause of the Sixth Amendment).

## BACKGROUND

The Ohio Court of Appeals summarized the events leading to Vivian Johnson's death and Petitioner's murder conviction:

On the evening of January 5, 1994, [Petitioner] and companions Shawn Caston and Daryl Turner were drinking at Whitlee's Bar in Sandusky, Ohio.  While at the bar, Caston became involved in an argument with Jerome Caffey.  At the conclusion of this dispute, Caffey left Whitlee's and Caston rejoined Petitioner and Turner.  The next morning at approximately 3:00 a.m., Caffey was in the house he shared with Anna Hunt, his aunt.  With Caffey was an acquaintance, Sharon McGill.  Caffey's aunt also had guests.  Tammy Johnson, her sister Vivian Johnson, and Laurie Henry were returning from a graduation party for Vivian's daughter when Tammy and Laurie decided to stop at Anna Hunt's.  Tired, Vivian Johnson remained in the car while the other two went inside.  As Tammy and Laurie prepared to leave the house, it was sprayed with multiple gun shots.

2

In the house, a bullet struck Sharon McGill. Another bullet shattered the window of the car in which Vivian Johnson was sitting and struck her in the neck. The bullet which struck Sharon McGill lodged in her abdomen, but she survived. Vivian Johnson died two days later as a result of her wound.

Police investigators searched the scene and found twelve spent nine millimeter shell casings of a type compatible with those used in an Intertech nine millimeter semiautomatic weapon. In an initial interview with police, a neighbor across the street stated that he had heard, but not seen, the shooting. He described hearing a four cylinder car with a loud muffler.

Police attention quickly focused on [Petitioner], Caston and Turner. Witnesses described the dispute between Caston and Caffey at Whitlee's Bar. One witness at the bar reported over-hearing a conversation the trio had after the dispute occurred. The witness relayed that [Petitioner] told Caston, with reference to Caffey, that "he wouldn't waste his time on one of them. He'd cap one of them." [Petitioner], Caston and Turner were also seen together just a few minutes before the shooting in a car at a Shell station a short distance from Caffey's house.

On June 6, 1994, late in the afternoon, police first interviewed [Petitioner]. [Petitioner] denied making any statement to Caston to "cap" anyone. When asked of his whereabouts at the time of the shooting, [Petitioner] said he had spent the night with Daryl Turner at Turner's girlfriend's house. When Turner's girlfriend failed to substantiate this alibi, [Petitioner] said he had lied to keep secret an extra marital affair he was having with Krista Harris. According to [Petitioner], he had spent the night with Harris in a motel.

Harris initially supported [Petitioner]'s story and went so far as to provide him with an alibi when she testified before a grand jury. Later though, Harris changed her testimony. During [Petitioner]'s trial, Harris stated that [Petitioner] was supposed to meet her in a motel room a few blocks from the shooting scene, but he did not show up until sometime after 3:15 a.m. When he did arrive, according to Harris, he appeared nervous and shaken. Harris also testified that the next morning she overheard a telephone conversation between [Petitioner] and Turner in which the shooting was discussed and [Petitioner] stated that they "had to get the gun." [Petitioner] left and returned with Turner a short time later; Turner was carrying a duffle bag.

[Petitioner] and Turner then went to Columbus, Ohio, where they stayed for the next week. In her trial testimony, Harris reported receiving numerous telephone calls from [Petitioner] during this period. [Petitioner] advised Harris during the phone calls, "*** not to talk to police, [and] that I was going to be his alibi so he wouldn't go to jail ***." Over [Petitioner]'s objection, Harris also testified that during one of her telephone conversations with [Petitioner] he gave the phone to Turner. Turner,

3

according to Harris, warned her that she was too involved to talk to the police.  He also told Harris that he had provided Shawn Caston with the gun, "*** [t]o take Jerome Caffey out," and that he and [Petitioner] then, "*** got rid of it."

During the course of the investigation another witness changed his story.  The neighbor from across the street who previously only reported hearing the shooting now admitted he had seen the shooting, but concealed the information from investigators out of fear of becoming involved.  The neighbor told police and later testified that he had seen three black males in a compact car with a loud muffler shoot into the Caffey/Hunt house.  He also noted that during the shooting he saw one of the occupants of the car pass the gun to a front seat passenger who shot it while holding it over the windshield.

The neighbor's observation of the gun being fired over the windshield became important because when investigators examined the car owned by Shawn Caston's girlfriend, a compact car without a muffler, they found another nine millimeter shell casing lodged in the well between the windshield wiper and the hood.  Experts determined that the firing markings on this shell matched those of the twelve casings found at the shooting scene.

In addition to this evidence, Daryl Turner admitted to police that he owned an Intertech nine millimeter pistol, but the weapon was never found.

[Petitioner], Turner and Caston were indicted on charges arising out of the drive-by shooting.  Petitioner was indicted on seven counts: aggravated murder, murder, and involuntary manslaughter (all relating to the death of Vivian Johnson), unlawful discharge of a firearm into an inhabited dwelling, felonious assault on Sharon McGill, and attempted aggravated murder and attempted felonious assault (both relating to Jerome Caffey).  The charges also contained firearm specifications and injury specifications. [Petitioner] plead[ed] not guilty and the matter proceeded to trial.  The three men were tried separately.

At trial, the state presented evidence which included testimony concerning the altercation at Whitlee's and [Petitioner]'s comments relative to Caffey.  The neighbor who witnessed the shooting and Krista Harris also testified.  At the conclusion of the state's case in chief, the trial court overruled [Petitioner]'s motion for a judgment of acquittal.  [Petitioner] presented no defense.  On deliberation, the jury found [Petitioner] guilty on all counts except the involuntary manslaughter charge.  The trial court entered judgment on the verdict and sentenced [Petitioner] to life imprisonment.

*State v. McDonald*, No. E-95-046,  1997 WL 51221, *1-*3 (Ohio Ct. App. Feb. 7, 1997).

4

*Harris' Grand Jury and Trial Testimony*

As noted by the Ohio courts, Krista Harris provided an alibi for Petitioner during her initial grand jury testimony on June 16, 1994.  Specifically, Harris testified that she met Petitioner at a hotel room between 2:00 a.m. and 2:30 a.m. early on June 6, 1994, well before the shootings occurred. Erie County Prosecutor Kevin Baxter and Detective Roy Prewitt, who were investigating the case, believed she was lying, and they admonished her during this grand jury testimony and during follow-up interviews that she should tell the truth (Hearing Tr. 43-44, 58-59, 95).  On June 23, Harris contacted Prewitt and advised him that she had lied to the first grand jury in order to protect Petitioner.  Prewitt conducted another interview, this one taped, during which Harris claimed Petitioner had been calling her often "to see how she was holding up" (Hearing Tr. 97).  Two months later, in August 1994, Harris testified adversely to Petitioner to a second grand jury, and again at Petitioner's trial in June 1995.  At trial, Petitioner's counsel cross-examined Harris extensively about her inconsistent grand jury testimony (Trial Tr. 787-806).  Harris testified that she had lied to the first grand jury because Petitioner threatened her (Trial Tr. 807-813).

*Harris' Affidavit*

More than six years after Petitioner's trial (after Petitioner's conviction had been affirmed on appeal and his first request for federal habeas relief denied), Harris came forward with allegedly new information.  In December 2001, she filed an affidavit in the Erie County Common Pleas Court, setting forth a number of allegations of coercion and misconduct by the Erie County Prosecutor. Specifically, the affidavit alleged:

5

In 1994 Affiant at the age of twenty was coerced by threat of false criminal charges including accessory to murder by the Erie County Prosecutor Kevin Baxter into providing false testimony in the trials of State v. Darryl Turner and State v. Dewitt McDonald.

In 1994, Affiant was coerced into a non-consensual sexual relationship with the Erie County Prosecutor Kevin Baxter by threat of false criminal charges including being an accessory to murder prior to the trials of [McDonald and Turner].

After the trials [of McDonald and Turner] . . . and while being forced to engage in a non-consensual sexual relationship with the Erie County Prosecutor Kevin Baxter, Affiant was ordered to move to Cleveland Ohio by Erie County Prosecutor Kevin Baxter in order to conceal the relationship.

In order to facilitate the move . . . , the Erie County Prosecutor Kevin Baxter provided a check to Krista Harris drawn on the Erie County Prosecutor's Furtherance of Justice Fund in order to pay for a U Haul truck.

In order to facilitate the move . . . the Erie County Prosecutor Kevin Baxter provided a check to Krista Harris made out to Janet Torres in the amount of $800.00 drawn on the account of the Erie County Prosecutor's Furtherance of Justice Fund.

(Doc. No. 55-1, p. 50) (paragraph numbering omitted).  The affidavit also described Baxter's alleged drug use,[1] as well as Harris' attempts to contact various law enforcement agencies about Baxter.  According to the affidavit, all agencies refused to investigate her allegations.

*Harris' Criminal Case and Attorney Baumgartner*

The circumstances surrounding Harris' affidavit require some explanation.  Harris had been indicted in Erie County in March 2001 on charges of theft of money and property from her great-great aunt; more charges were added in November 2001.  *See State v. Harris*, No. E-02-019, 2003 WL 22233590, at *1 (Ohio Ct. App. Sept. 30, 2003).  Harris was prosecuted by Special Prosecutor Dean Holman (from neighboring Medina County), because Erie County Prosecutor Baxter had disqualified

---

[1] Petitioner makes much of Baxter's alleged drug use.  However, this Court fails to see the relevance of such allegations to Petitioner's claims and therefore will not discuss them at any length.

6

himself due to a conflict of interest.  That conflict arose because Harris was a potential witness in the upcoming retrial of Shawn Caston (one of Petitioner's co-defendants), whose first conviction had been vacated on habeas review (Hearing Tr. 39; Doc. No. 61-3, p. 125), *see Caston v. Mitchell*, 12 F. App'x 208 (6th Cir. 2001).  Harris' affidavit was attached to a motion filed by her then-attorney, Elsebeth Baumgartner (Doc. No. 5-2, pp. 1-11).  Baumgartner's motion sought to disqualify Special Prosecutor Holman and to quash the indictment against Harris.  The gist of Baumgartner's motion was that the charges against Harris were fabricated, and that Baxter and Holman were conspiring to silence Harris because of her knowledge of Baxter's corrupt activity.

This was not the first time Baumgartner had made accusations against public officials, nor was it the last.  In a slew of public complaints and lawsuits beginning in 1999, Baumgartner accused numerous local, state, and federal officials of fraud and corruption.[2]  No court found any merit to her allegations.  In 2003, she was permanently disbarred from the practice of law in state and federal court.  *See Office of Disciplinary Counsel v. Baumgartner*, 100 Ohio St. 3d 41, 50 (2003); *In re Baumgartner*, 123 F. App'x 200, 202 (6th Cir. 2005).  Baumgartner continued to file *pro se* complaints, and she was declared a vexatious litigator by the Ohio courts in 2004.  *See State v.*

---

[2]

*See Office of Disciplinary Counsel v. Baumgartner*, 100 Ohio St. 3d 41, 41-43 (2003) (recounting Baumgartner's history of unfounded complaints and lawsuits from 1999 to 2002); *see also In re Appointment of Special Prosecutor*, No. OT-01-030, 2002 WL 602744, at *1 (Ohio Ct. App. April 19, 2002) (Baumgartner filed a "citizen's complaint" seeking the arrest and prosecution of various local judges, prosecutors, and defense attorneys for alleged public corruption); *Baumgartner v. Murman*, No. 02-CV-1911, Jan. 31, 2003 Order (N.D. Ohio) (Baumgartner filed a federal civil rights action against various local and state officials, alleging a wide-ranging conspiracy against her); *Baumgartner v. Moyer*, No. 03-CV-7597, April 6, 2004 Order (N.D. Ohio) (Baumgartner filed a civil conspiracy suit against forty public officials, including federal judges and the Chief Justice of the Ohio Supreme Court); *Baumgartner v. Schnoor*, No. 3:04-CV-7737, 2006 WL 2044984, at *1-*2 (N.D. Ohio July 19, 2006) (Baumgartner filed a federal civil rights action against a school board, county and village officials, a newspaper, the Chief Justice of the Ohio Supreme Court, the former Ohio Attorney General, and others; and she moved to disqualify the presiding judge because of bias and "case-steering").

*Baumgartner*, No. E-06-045, 2006 WL 2045913, at *1 (Ohio Ct. App. July 17, 2006).  Some of Baumgartner's actions resulted in criminal charges against her, and she was eventually convicted of falsification, criminal contempt, intimidation, and retaliation.[3]

The disciplinary proceedings resulting in Baumgartner's disbarment shed some light on her representation of Harris during 2001-02.  The disciplinary board heard testimony from a number of witnesses involved in Harris' case.  Among those was defense attorney Denise Demmitt, who was appointed to represent Harris before Baumgartner was retained.  Demmitt testified that Baumgartner's interference (even before Baumgartner was officially involved in the case) made it very difficult to communicate with Harris.  For example, the first time Demmitt met with Harris, Baumgartner "showed up . . . and for an hour and a half . . . told [Demmitt] of how there were conspiracy theories going on with public officials all over the State of Ohio" (Doc. No. 61-3, p. 110).

In the fall of 2001, Special Prosecutor Holman offered Harris "diversion," whereby Harris could escape criminal charges in exchange for a period of probation and repayment of the stolen money (Doc. No. 61-3, pp. 106, 109; Tr. 114-115).  Demmitt believed this deal was in Harris' best interest, but Baumgartner apparently persuaded Harris to fight the charges and go to trial. Baumgartner entered an appearance as co-counsel for Harris in late December 2001, and soon filed the motion to disqualify Holman, attacking both him and Baxter.  Unbeknownst to Demmitt (who was still lead counsel for Harris), Baumgartner subpoenaed some sixty witnesses (including the Ohio

---

3

*See, e.g., State v. Baumgartner*, No. OT-02-029, 2004 WL 1662206, at *1 (Ohio Ct. App. July 23, 2004) (falsification); *State v. Baumgartner*, No. OT-06-046, 2008 WL 612901, at *1 (Ohio Ct. App. March 7, 2008) (criminal contempt); *State v. Baumgartner*, Nos. 89190, 91207, 91208, 2009 WL 344988, at *1 (Ohio Ct. App. Feb. 12, 2009) (intimidation, retaliation, falsication); *see also Baumgartner v. Bratton*, No. 3:07-CV-878, 2010 WL 419966 (N.D. Ohio Jan. 29, 2010) (dismissing Baumgartner's federal habeas petition challenging her contempt convictions).

Supreme Court Chief Justice) for a January 2002 hearing on her motion to disqualify Holman (Doc. No. 61-3, pp. 112-14).  At that point, Holman made a motion to disqualify Baumgartner, which the court granted (Doc. No. 61-3, p. 113).

Demmitt too was later forced to withdraw from the case, because she was unable to communicate with Harris.  Harris, however, with a new attorney, still insisted on rejecting Holman's offer of diversion.  Harris was eventually tried and convicted by a jury on all counts and sentenced to five years in prison.  *See State v. Harris*, No. E-02-019, 2003 WL 22233590, at *1 (Ohio Ct. App. Sept. 30, 2003).  Demmitt summarized Baumgartner's involvement in this way: "[Baumgartner] was not a criminal defense lawyer, but she signed on to this case because she saw a host.  She saw a chance that she [could propagate] her agenda through this . . . [woman who is now] sitting in prison. It is a travesty" (Doc. 61-3, p. 119).

*BCI Investigation*

Around the time of her criminal case, Harris made allegations about Baxter in at least one other forum.  In December 2001, she contacted Ohio's Bureau of Criminal Identification & Investigation ("BCI"), and on December 18 was interviewed by Agents Rhonda Dendinger and Rex Russell.  Dendinger's notes of the interview reveal more details about Harris' allegations of a sexual relationship with Baxter, including details about the interior of Baxter's home, where some of their assignations allegedly occurred (Doc. No. 55-5, p. 45).[4]  Harris was asked about what actually happened on the night of the shooting; she claimed she did not know, but that "word on the street was

---

[4]

A videotape recording of Harris' BCI Interview is part of the record in this case.  At the request of BCI, it has remained under seal, but counsel for both sides have reviewed it, as has this Court.  Based on that review, this Court finds that Dendinger's notes are an accurate and thorough summary of the interview.

9

that [Petitioner] was there" (Doc. No. 55-5, p. 46).  She further claimed she was pressured to lie by both Petitioner and Baxter.

On January 11, 2002, Agent Russell sent a letter to Denise Demmitt (who was still representing Harris at that time) regarding Harris' allegations.  The letter included the following:

> Ms. Harris told agents she wanted the allegations fully investigated within weeks so that any criminal charges emanating from [her allegations] would precede her own felony trial . . . Ms. Harris's aggravation with the inability of investigators to investigate and indict within weeks in order to precede, and ultimately preclude, her own prosecution on a separate issue is cause for concern.

(Doc. No. 55-5, pp. 35-36).  Agent Dendinger testified at this Court's evidentiary hearing that Harris wanted to "control the interview" and did not want the agents to talk to other people about her allegations (Hearing Tr. 84-85).  Following the December 18 interview, Harris was uncooperative and difficult for agents to reach (Hearing Tr. 85-86).  Ultimately, the BCI agents failed to find evidence to substantiate Harris' allegations, and closed their investigation (Hearing Tr. 86).

*Harris' Testimony in the Instant Case*

More than seven years after she filed her affidavit, in July 2009, Harris gave deposition testimony for this Petition.  She was questioned extensively about her testimony in Petitioner's trial, the allegations in her affidavit, and her interview with the BCI agents.  Without exception, her answers to these questions were some variant of "I do not know" or "I do not recall."  Indeed, she was unable or unwilling to confirm or deny that she had signed the affidavit or participated in Petitioner's trial.  However, she *was* able to recall extensive details about her own criminal case in 2001 and 2002, apart from her affidavit (Harris Dep. pp. 25-36).  She claimed she was suffering from post-traumatic stress disorder, diagnosed by a doctor while she was in prison, which blocked her memory of Petitioner's trial and her 2001 affidavit.

Harris' testimony at the recent evidentiary hearing tracked her deposition testimony. She still could not recall any details whatsoever about Petitioner's trial. Indeed, she could not recall any of her previous testimony, her alleged relationship with Baxter, her 2001 affidavit, or her interview with BCI agents (Hearing Tr. 4-14). As in her deposition, Harris claimed she had post-traumatic stress disorder (Hearing Tr. 14).[5]

*Other Evidence Related to Harris' Affidavit*

The record in this case contains three documents relating to the claim in Harris' affidavit that Baxter forced her to move to Cleveland:

- a September 7, 1995 check in the amount of $219.92 from "Kevin J. Baxter, Prosecuting Attorney" to "Lizzi Brothers Mobile Service" for "U-Haul rental (Krista Harris)" (Doc. No. 55-1, p. 59);

- a record of Krista Harris' U-Haul rental, for $219.92 (Doc. No. 55-1, p. 61);

- a receipt for a deposit of $770 from Janet Torres to Krista Harris (Doc. No. 55-1, p. 60).

These documents match the allegations in Harris' 2001 affidavit, and neither party disputes their authenticity.[6]

During Baumgartner's disciplinary proceedings in 2002, Baxter acknowledged that he used his office's Furtherance of Justice Funds to help move Harris out of Sandusky in 1995 after she

---

[5]

At the hearing, the Court asked Harris if she would allow the Court to view the records of the prison doctor who diagnosed her post-traumatic stress disorder (Hearing Tr. 24). As of the date of this Opinion, Harris, through her attorney, informed the Court she was "not inclined" to release the records.

[6]

Harris' affidavit alleges that Kevin Baxter wrote two checks - - one for the U-haul rental and a second to Janet Torres for $800. This second check does not appear in the record. However, there is a written receipt for $770, from Janet Torres to Krista Harris, and Baxter acknowledges using Furtherance of Justice Funds to help Harris pay a deposit on a Cleveland apartment, so it seems likely that Baxter did in fact write a second check in 1995.

specifically requested help moving to Cleveland, expressing fear of retaliation by Petitioner (Doc. No. 61-3, pp. 123-25). Both Baxter and Detective Prewitt testified consistently with this version of events at the evidentiary hearing (Tr. 49-50, 98).

In addition, Edward Baxter (known as "Ejay"), the brother of Kevin Baxter, signed an affidavit back in April 2003, in which he stated that he had "first hand knowledge that Erie County Prosecutor, Kevin J. Baxter, coerced Krista Harris to lie in a drive-by shooting [case] then forced her into a non consensual sexual relationship" (Doc. No. 55-1, p. 56). However, Ejay testified during Baumgartner's disciplinary hearing that he only heard about the alleged relationship when Harris told him during a phone call on December 8, 2001, the first time he and Harris met (Doc. No. 61-2, pp. 71-72). Ejay had numerous meetings and phone calls with Baumgartner between 2000 and 2002 (Doc. No. 61-3, pp. 19, 30-31), and he earlier had a falling out with his brother Kevin after a bitter estate battle following their parents' death (Tr. 41, 52, 109-110; Doc. No. 55-5, p. 29).

*Media Coverage and Attorney Espy*

Harris' criminal case received some attention in the local press, which is important to the procedural history of this Petition. On January 9, 2002, the *Fremont News-Messenger* published an article mentioning that Krista Harris had alleged criminal wrongdoing by Baxter. Rick Neale, *Rocket Official Files Complaint Against Baumgartner*, THE NEWS-MESSENGER, Jan. 9, 2002, at 3A (Doc. No. 5-2, p. 80). On February 1, 2002, the *Columbus Dispatch* published an article about Baumgartner's accusations against various Ohio officials. Jon Craig, *Lawyer Says Court Trying to Silence Her About Corruption*, THE COLUMBUS DISPATCH, Feb. 1, 2002, at 4B (Doc. No. 5-2, pp. 83-85).

The *Dispatch* article noted that "Harris detailed several alleged crimes [by Baxter], including: [a] 'nonconsensual sexual relationship with Kevin Baxter[;] [b]eing coerced by Baxter to provide false

12

testimony in two murder trials[; and] [b]eing given an $800 check by Baxter to move to Cleveland and 'conceal their relationship.'"  The *Dispatch* article also stated that "Ben Espy, a Columbus lawyer, said he may ask for a new trial in a client's murder case based on Baumgartner's renewed accusations about the Erie County prosecutor," and "Espy . . . thinks he might get a new trial for DeWitt McDonald 'if I verify some statements.'"

At the time the *Dispatch* article was published, Espy was representing Petitioner's father, DeWitt McDonald, Sr., who was attempting to recoup a retainer paid to the attorney who handled Petitioner's first habeas case.  The record is fuzzy as to whether Espy was also representing Petitioner at that time.  Espy submitted a rather vague affidavit stating that his official representation of Petitioner did not begin until sometime after August 1, 2002 (Espy Aff. ¶¶ 3-5, Doc. No. 55-5, pp. 51-52), well after the February 1, 2002 *Dispatch* article referred to Petitioner as Espy's "client."  Further, Espy wrote a January 31, 2002 letter to Petitioner's previous attorney, requesting "on behalf of Mr. McDonald, Sr. and Mr. McDonald, Jr." that the attorney return the retainer, noting that Espy would "advise them what additional steps they have to take to be reimbursed" (Doc. No. 55-5, pp. 53-54).

### PROCEDURAL HISTORY

Petitioner's conviction was affirmed on direct appeal, and the Ohio Supreme Court denied review.  His attempts to obtain state post-conviction relief were unsuccessful.  In May 1998, he filed his first federal habeas petition, which was denied; the Sixth Circuit declined to issue a certificate of appealability in February 2000.

Harris filed her affidavit on December 21, 2001.  Petitioner's first filing following the affidavit was on May 1, 2003, when he filed a petition for post-conviction relief in Ohio state court.  At that time, Petitioner was represented by Ben Espy.  Over the next several years, Petitioner continued to

13

seek redress in state court.  In 2006, he sought leave to file a second federal habeas petition.  The

Sixth Circuit granted his request in January 2008, and he then filed the instant Petition.

DISCUSSION

*Statute of Limitations*

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a one-year statute of

limitations applies to habeas petitions challenging state convictions.  28 U.S.C. § 2244(d)(1).  The

limitations period runs from the latest of:

> (A)  the date on which the judgment [of conviction] became final . . .

> (B)  the date on which the impediment to filing an application created by State action . . . is removed . . .

> (C)  the date on which the constitutional right asserted was initially recognized by the Supreme Court . . . or

> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

*Id.*  In this case, Subsection 2244(d)(1)(D) provides the starting point: the date on which Petitioner,

through reasonable diligence, could have discovered the factual predicate of his claims.  The factual

predicate of Petitioner's claims is Harris' affidavit, the first time she publicly asserted any wrongdoing

by Prosecutor Baxter in relation to Petitioner's trial.  The question, then, is when Petitioner became

aware, or reasonably should have become aware, of Harris' affidavit.

A fair reading of the record indicates that Petitioner knew or should have known about Harris'

affidavit by February 1, 2002, at the latest.  Harris filed the affidavit in her own court case on

December 21, 2001; it was therefore a public record as of that date.  Petitioner, who was incarcerated

at the time, cannot be expected to have known about Harris' affidavit immediately.  *See Granger v.*

*Hurt*, 90 F. App'x 97, 100 (6th Cir. 2004) (accounting for the reality of the prison system in

14

considering whether a habeas petitioner had exercised due diligence).  However, Harris' allegations soon received attention in the local press.  Importantly, those allegations were detailed in a *Columbus Dispatch* article on February 1, in which Espy was quoted as saying he might seek a new trial for Petitioner based on Harris' allegations.

The newspaper articles themselves may have put Petitioner on notice of Harris' affidavit.  *See Sierra v. Evans*, No. 98-6040, 1998 WL 712578, at *2 (10th Cir. 1998) (noting that a habeas petitioner could have discovered information underlying his habeas claims through newspaper reports).  But the February 1 *Dispatch* article reveals even more than Harris' allegations against Prosecutor Baxter.  It reveals that Espy -- the lawyer who represented Petitioner in his first state post-conviction proceeding -- was aware of Harris' affidavit sometime before February 1, 2002, and was considering legal action.  As noted above, the record is not clear as to whether Espy was "officially" representing Petitioner on February 1.  However, Espy's own letters indicate he was communicating with both Petitioner and Petitioner's father.

Taken together, this information indicates Petitioner's family and his family's attorney (who were almost certainly communicating with Petitioner) knew about Harris' affidavit sometime in January 2002.  It is unlikely that Espy would announce publicly his intention to seek a new trial on Petitioner's behalf but fail to tell Petitioner the same.  Therefore, even if Espy's official representation of Petitioner did not begin until later in 2002, Petitioner himself had to know of the factual predicate of his current claims before that representation began.

Therefore, the most plausible reading of the record indicates Petitioner knew about Harris' affidavit by February 1, 2002.  Petitioner then has the burden of proving that some later date is more appropriate for starting the one-year clock.  *DiCenzi v. Rose*, 452 F.3d 465, 471 (6th Cir. 2006)

(Petitioner "bears the burden of proving that he exercised due diligence."). Merely asserting that he exercised due diligence is insufficient; Petitioner should explain when he discovered the relevant facts, as well as what steps he took to do so. *See Stokes v. Leonard*, 36 F. App'x 801, 804 (6th Cir. 2002) ("An application that merely alleges that the applicant did not actually know the facts underlying his . . . claim is insufficient to show due diligence.") (internal quotation and citation omitted); *Redmond v. Jackson*, 295 F. Supp. 2d 767, 772 (E.D. Mich. 2003) ("Petitioner has failed to offer any explanation how the factual predicate of his claims could not have been discovered earlier, nor does he indicate what steps, if any, he took to discover those claims.").

Petitioner fails to carry his burden of showing due diligence. The lengthy record is strangely silent on this point. Petitioner never states when he learned of Harris' affidavit, or what steps he took to discover the basis for his current claims. Petitioner's main argument against finding a violation of the one-year limitations period seems to be that the record is incomplete, and so this Court cannot make a finding on due diligence one way or the other (Doc. No. 55, pp. 45-46). That argument is untenable, for at least three reasons. First, Petitioner was on notice of Respondent's statute of limitations argument even before he filed the instant Petition, as Respondent raised the same argument with the Sixth Circuit regarding Petitioner's application to file a second habeas petition. *See In re McDonald*, 514 F.3d 539, 543-44 (6th Cir. 2008). The Sixth Circuit stated specifically that it was "leav[ing] the [statute of limitations] inquiry to the district court once, and assuming, [Petitioner] actually files his second *habeas corpus* petition." *Id.* at 544.

Second, this Court granted Petitioner extra time and funds for discovery, and the Petition has now been pending for over two and a half years. Petitioner has had multiple opportunities to address the statute of limitations issue -- in briefs both before and after the Magistrate filed her R&R, as well

16

as at the evidentiary hearing when this Court specifically asked Petitioner's counsel to comment on the issue (Hearing Tr. 133-36). Petitioner cannot credibly claim he lacked opportunity to demonstrate his due diligence in discovering the basis for his claims. Rather, he simply failed to do so.

Third, Petitioner cannot hide behind the lack of a record on this issue, because Petitioner has the onus of showing that he was unable to access the information forming the basis of his claims -- particularly when that information was of public record, reported in the press, and known by his family and family's attorney. He has never argued, let alone demonstrated, that he was somehow prevented or precluded from accessing any of these sources, or that his family or Espy withheld information from him -- a rather implausible scenario in any event.

This Court therefore finds that Petitioner knew or should have known about the Harris affidavit by February 1, 2002, thus triggering the one-year limitations period. The statute of limitations expired one year later, on February 1, 2003. Petitioner's first filing was not until May 1, 2003 -- three months after the one-year period expired. His current habeas Petition is necessarily time-barred.

*Equitable Tolling*

A habeas petitioner who misses AEDPA's one-year filing deadline may be entitled to equitable tolling. *Dunlap v. United States*, 250 F.3d 1001, 1007 (6th Cir. 2001). However, "equitable tolling relief should only be granted sparingly." *Cook v. Stegall*, 295 F.3d 517, 521 (6th Cir. 2002). In considering whether to grant equitable tolling, this Court must consider:

> (1) the petitioner's lack of notice of the filing requirement; (2) the petitioner's lack of constructive knowledge of the filing requirement; (3) diligence in pursuing one's rights; (4) absence of prejudice to the respondent; and (5) the petitioner's reasonableness in remaining ignorant of the legal requirement for filing his claim.

17

*Dunlap*, 250 F.3d at 1008.  Though Petitioner claims he is invoking the equitable tolling doctrine, he does not argue that he satisfies any one of these factors.  For similar reasons to those expressed above, this Court concludes that equitable tolling is not appropriate in this case.  There is no evidence that Petitioner was ignorant of the filing requirements or that he had good reason to delay filing his claim.

　　*Actual Innocence*

　　Even if equitable tolling does not apply, a credible claim of "actual innocence" will excuse a statute of limitations violation in a habeas case.  *Souter v. Jones*, 395 F.3d 577, 602 (6th Cir. 2004).  To show actual innocence in this context, a petitioner must present new facts that raise "'sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial.'"  *Id.* at 590 (quoting *Schlup v. Delo*, 513 U.S. 298, 316 (1995)).  In other words, "'a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'"  *Id.* (quoting *Schlup*, 513 U.S. at 327)).  To support such a claim, a petitioner must present "'new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial.'"  *Id.* (quoting *Schlup*, 513 U.S. at 324)).  Viable claims of actual innocence will occur only in rare, extraordinary cases.  *Id.*

　　As to new evidence contained in affidavits, a court "may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence." *Schlup*, 513 U.S. at 531.  "[R]ecanting affidavits are always viewed with 'extreme suspicion.'" *Williams v. Coyle*, 260 F.3d 684, 708 (6th Cir. 2001) (quoting *United States v. Chambers*, 944 F.2d 1253, 1264 (6th Cir. 1991)).  A court need not accept all new facts submitted by a petitioner as true; rather, credibility determinations are appropriate.  *See Schlup*, 513 U.S. at 531 ("[A c]ourt is not

18

required to test the new evidence by a standard appropriate for deciding a motion for summary judgment.")

Under the actual innocence framework, the basic question in this case is whether Harris' 2001 affidavit, and her concurrent interview with the BCI agents, constitutes "new, reliable" evidence that undermines confidence in the outcome of Petitioner's trial.[7]  This Court concludes that Harris' allegations are not reliable, and therefore Petitioner has not established a viable actual innocence claim.  The evidence undermining the reliability of Harris' new allegations is considerable: she made them many years later while facing her own criminal charges, she was represented by an attorney known to fabricate accusations against public officials, she has told at least three different stories about the night of the shooting, and she is now unable, or unwilling, to recall any details whatsoever about her allegations against Baxter or her role in Petitioner's trial.  By contrast, the evidence corroborating Harris' allegations -- the checks from Baxter's office and Harris' knowledge of the interior of Baxter's house -- is slim at best, and subject to reasonable alternative explanations.[8]

First, Harris had a personal motive for making allegations against Baxter, as she was under indictment on theft charges at the time.  The BCI agents noted in a letter to Harris' attorney that Harris

---

[7] Petitioner highlights a number of other facts that he argues support his actual innocence claim.  For example, he points to the 2003 affidavit of Quintin Miller, which states that Miller saw McDonald "going in the opposite direction of the shooting" by himself approximately 15 minutes before the shooting (Doc. No. 5-2, pp. 161-62).  However, the facts in Miller's affidavit are not "new."  Miller's affidavit states that he informed Petitioner of his observations when they were incarcerated together before Petitioner's trial.  The other facts presented by Petitioner are of a similar ilk; they offer no new, reliable evidence that might cast doubt on Petitioner's conviction.  The focus of this Petition is on Krista Harris, whose trial testimony was clearly pivotal.

[8] This is the primary difference between the Magistrate's R&R and this Court's assessment.  The Magistrate did not discuss how the circumstances surrounding the creation of Harris' affidavit impacted its credibility.  This Court, troubled by those circumstances, held an evidentiary hearing to assess Harris' credibility (Doc. No. 72).

wanted the investigation against Baxter concluded within weeks -- before her own trial -- and that Harris became aggravated when the agents explained that the investigation would take time.  Agent Dendinger confirmed at the evidentiary hearing that Harris wanted to "control" the interview and was generally uncooperative with the agents.  Harris' apparent desire that her allegations of prosecutorial misconduct forestall her own criminal case undermines the reliablity of her affidavit.

Second, Harris' relationship with Elsebeth Baumgartner in December 2001 casts further doubt on the truth of Harris' allegations.  Baumgartner's history of unfounded accusations against public officials is well-documented.  Harris' affidavit was attached to a motion filed by Baumgartner, and though the record contains no direct evidence on this point, it seems likely that Baumgartner drafted the affidavit.  Denise Demmitt believed that Baumgartner inserted herself in Harris' case in order to advance Baumgartner's own conspiracy theories.  Baumgartner's bizarre behavior leading up to the hearing on her motion to disqualify Special Prosecutor Holman supports Demmitt's view; Baumgartner subpoenaed sixty witnesses for the hearing, including the Ohio Supreme Court Chief Justice.  In sum, the circumstances surrounding the creation of Harris' affidavit undermine its reliability.

Third, Harris' general lack of credibility is obvious.  Petitioner's counsel conceded as much at the evidentiary hearing (Tr. 124) ("[P]etitioner is not here vouching for Krista Harris' credibility . . . That would be a fool's errand.").  She has told three different stories about the night of the shooting: at the initial grand jury, where she said Petitioner was with her in the hotel room before the shooting; at the second grand jury and trial, where she reversed course and implicated Petitioner in the shooting; and to BCI agents in 2001, where she said she did not know if Petitioner was involved, but that the "word on the street" said he was.

Now, Harris is unable or unwilling to recall details of any version, nor even the fact that she once told them, and has no other credible support for her 2001 allegations against Baxter. Petitioner suggests that Harris is unwilling to speak because she is afraid of Kevin Baxter. Yet she was willing to speak against him in 2001, and he wielded the same power as a county prosecutor then as he does now. Petitioner offers no evidence that Harris has been threatened into silence by Baxter or anyone else.

As for the checks Baxter wrote to help Harris move from Sandusky to Cleveland in 1995, he has never denied using his office's funds for that purpose. Baxter testified in 2002, and again at the evidentiary hearing, they were proper and legitimate expenditures based on Harris' fear of retaliation by Petitioner or his friends. Detective Prewitt confirmed that Harris had requested assistance moving out of Sandusky.

As for Harris' apparent knowledge of the details of Baxter's house, which she related to BCI agents, the parties dispute whether Harris' account is accurate. Baxter testified that some details were accurate and some were not, and that Harris' description was missing some significant features. Even assuming Harris' description was accurate, she could easily have learned details of Baxter's house from someone else -- Baxter's disgruntled brother Ejay, for instance. Given the existence of reasonable alternative explanations for the checks and for Harris' sketchy knowledge of Baxter's house, this corroborating evidence is of little value.

Finally, Ejay Baxter's affidavit provides no support for Harris' allegations. Beyond Ejay's clear bias against his estranged brother, it is clear from his 2002 deposition testimony that he has no direct knowledge of an improper relationship between Harris and Kevin Baxter. Rather, his knowledge is derived from what Krista Harris told him.

21

In the final analysis, this is a classic "he said, she said" case. However, the "she said" half of the case, on which Petitioner relies, is undermined by a number of factors: Harris' motive to escape her own criminal charges, Elsebeth Baumgartner's role in the creation of the affidavit, Harris' changing stories about the shooting, and Harris' current inability or refusal to confirm or deny any of the allegations in the affidavit. In sum, Petitioner fails to present "new, reliable" evidence that would undermine this Court's confidence in Petitioner's conviction. Petitioner therefore fails to make a showing of actual innocence, and this Court cannot excuse the statute of limitations violation.

*Merits*

Because Petitioner's claims are barred by the statute of limitations, this Court need not address the claims on the merits. However, this Court notes that Harris' lack of credibility dooms Petitioner's claims on the merits as well. Petitioner's claims -- knowing use of perjured testimony, failure to disclose favorable information to the defense, and the denial of the right to present witnesses -- all revolve around the allegation that Baxter had an inappropriate relationship with Harris. After extensive discovery, hundreds of pages of briefing, and an evidentiary hearing, this Court finds no credible support for such a claim.

## CONCLUSION

For these reasons, the Petition for Writ of Habeas Corpus is dismissed. This Court grants a certificate of appealability on the issues of whether Petitioner's claim is barred by the statute of limitations and, if so, whether Petitioner has made a showing of actual innocence. Petitioner's Motion to Proceed In Forma Pauperis (Doc. No. 81) is denied as moot, as Petitioner has already paid the filing fee.

IT IS SO ORDERED.

          ____s/ *Jack Zouhary*____
          JACK ZOUHARY
          U. S. DISTRICT JUDGE

          July 30, 2010